Thank you. Good morning. This case involves several due process violations as well as several abuse of discretion violations both by the BIA as well as the immigration judge. The first one is starting with the Board of Immigration Appeals new allegation that my client, I mean, that Abolghasemi actually Counsel, I have a question about exhaustion of remedies. Did you exhaust your due process claims before the BIA? Exhaustion would have been futile in this case. The Board of Immigration Appeals was adamant in its position to not afford Abolghasemi a new hearing even in view of the changed circumstances, Your Honor, and kidnapping of a political activist. But that's not really the test, is it, Counsel? Isn't the test that you have to raise it with the Board and have the Board refuse to address it before we can examine it? Well, when the Board of Immigration Appeals denied Abolghasemi based on a new allegation, I had to get the tapes because up to that point, we didn't know what was it that the Board wanted to, you know, what was it that made such a big issue in this case. I had to get the tape at the time when the Board of Immigration Appeals made the new allegation. So technically, if the Board of Immigration Appeals only adopted the IJ's finding, that would have been sufficient. But since they made a new allegation, based on their new allegation, I had to get the tapes from the Board of Immigration Appeals. I'm still not sure. I think you and I are talking past one another here. It seems to me you are addressing concerns that arose at the time of the original merits hearing before the immigration judge and alleging that there were due process violations. Yes, Your Honor. I don't understand why, at least to those issues, you could not raise them initially with the Board without regard to what the Board later decided. Well, the Board later decided the very major issue, Your Honor. That's what made me think that I should have gotten the tape. I wasn't the original attorney in that case. But isn't that a concession that you defaulted on the due process claim by not raising them initially? So I think that the translation problems were so egregious that it is a violation of due process that I could bring it on first time on this appeal. You couldn't bring it because you hadn't listened to the tapes, is what I'm hearing you say, counsel. Well, but I didn't listen to the tapes only after the Board of Immigration Appeals denied Abol Ghasemi based on a new ground, Your Honor, which the immigration judge did not have. Could you – couldn't you have petitioned to reopen before the BIA? The BIA's position on this case was very adamant. Well, see, our problem – our problem is that we cannot decide something that hasn't been decided. So I suppose the most that we could do would be to – I'm not sure. Your Honor. Okay. Why don't you go on to some of your other grounds. One of – if Abol Ghasemi, if the – he would suffer irreparable harm in this case. If based on the noncompetent translation, he would be denied this relief. But this is not the only thing that I have raised in my – in my brief. There are several abuse of discretion violations that based on that alone, this case should have been remanded back to the immigration judge. For example, one of those is that the BIA stated a new ground of denial, but didn't afford my client an opportunity to rebut that. They had an opportunity to give oral argument. They could have remanded the case back to the judge. They didn't do that. Secondly, the BIA stated – What case do you have that – this raises an interesting question of how many times does the petitioner have to be confronted. As I understand the record, the BIA looked at the same record that was made before the immigration judge, upheld the immigration judge's findings, but then cited some additional reasons from the record why they felt that was the proper disposition. Is it your position that every time the board does that, that we now have to remand and give the petitioner an opportunity to address those grounds that were cited from the record? Yes, I do. I believe that an asylum – And what's your best case to support that? I don't have a case law right in front of me, Your Honor, but here is what I believe more than a case law in this case. When an asylum seeker is denied a case and is sent back to the country where he could be killed and persecuted, I believe he should be afforded every opportunity, every opportunity, to be able to voice his concerns before both the immigration judge, the BIA, and this court. How many times? Suppose that we remanded it and there's a further hearing before the immigration judge, new evidence is made, then you take another appeal to the BIA, the BIA upholds the decision the second time, but points to some other evidence that wasn't cited in the IJ's record. Would there ever be any end to the round-robin of appeals under the principle of law you're urging us to adopt? Okay, and what is the other choice? The other choice is we would send someone back to a country where he could be killed and persecuted because we're not willing to go ahead and see what other possibilities is there for the client to explain himself. He's here asking refuge from the government of the United States. He should be given, afforded an opportunity, as many opportunities as possible to be able to present his case. If you look at his case from the very beginning, he has what the trial attorney will call rambling or the government attorney would call rambling. He explains something over and over again in his brief, over in his transcript, over and over again, and they didn't understand what he was saying. And when you help me with the scenario here, who was present at the time of the hearing before the immigration judge? The ---- had an attorney, him and his attorney, yes. And the translation errors that you ---- and there was a government attorney and the immigration judge. Yes. And the immigration judge has some duty under our law to make sure that the record is comprehensive and comprehensible. Now, there was a translator, and is ---- some of the translation is ---- some of what is in the transcript is a little difficult to understand. Is it your position that that was the fault of whom? Your Honor, with all due respect, I believe the immigration judge had to remind the case, but he didn't understand what was going on. When he remanded, he ---- She would have asked for a different interpreter. She even asked in the transcript, and it says, to my client, do you understand the interpreter? But understanding what the interpreter is saying is not the same as understanding the content of what the interpreter is saying. Well, didn't his counsel have some obligation to object to the ---- Your Honor, the counsel at the time, we don't know when we're in court, like, for example, we don't know what issue is central to the immigration judge's decision-making. The counsel may have thought that his answers, and he stated it in the record, that the question was asked and answered. The fact that it wasn't understood, the counsel would not know this until the judge actually shows at the end, when she makes the oral argument, what she's focusing on. Once you know what you're focusing on, then the counsel realized that they needed more clarification. Up to that point, how does he know? He thinks his client has asked and answered the question, and he stated it several times. And I understand that it's difficult to read through the transcript, but if you really read through the transcript, he has answered all of these questions. Counsel, I'd like to direct your attention to Administrative Record 206, which is page 95 of the Merit-Bearing Transcript. And there is a lengthy question and answer between the government attorney and your client in which, in reading the record, at the very end, the government lawyer makes an objection that your client's answer is nonresponsive, and the court notes the objection and tells him to proceed. Why shouldn't I read that as simply being a point during the proceedings where government counsel flagged the fact that the witness was simply not answering the questions that were being presented to him? You Honor, some of the answers that the government ---- some of the answers to the questions are not yes and no answers. They need more clarifications. My client was an intellectual. He has a master's degree, and he was trying to explain a very difficult situation in Iran. First of all, he was trying to explain what the situation in Iran as far as the ---- what ---- he was a member of a committee. These kind of answers do not require a yes and no answers. It requires that he goes into the question. But, counsel, I can read the question that was posed to him, and I can read your counsel's or your client's answer. And then I note that the government lawyer made an objection which the court basically endorsed by noting it. And I read that as simply being a point in the proceeding where the government lawyer was trying to flag the fact that the witness was just evading the answers to the question. But he wasn't evading, Your Honor. He was trying to answer, give a more complete answer. That's what we're trying to say. Were you the counsel? No, I was not. I was not the counsel. But after ---- that's why I asked for the tapes. Right. Because I realized something is amiss in this. And it would really cause ---- he didn't have a chance to voice his story. He wasn't even being ---- he was cut off when he was trying to explain. Then he explained something several times, they would understand. Okay. You have used your time. If you want to ---- if you want a second to respond to something that the government says, you may have it. But your time has expired. Thank you. Good morning, Your Honors. Good morning. May it please the Court, my name is Reagan Hildebrand, and I represent the Office of the Attorney General in this matter. The Attorney General requests this Court to uphold the Board of Immigration Appeals' adverse credibility determination for two reasons. First, because Mr. Albolga's testimony contained inconsistencies with his supporting asylum documents. And second, because his general evasiveness indicated that his demeanor was one of incredibility. The Board of Immigration Appeals' credibility determination, Your Honors, was based upon specific and cogent reasons, grounded in substantial evidence in the administrative record before this Court. Since no reasonable fact finder would be compelled to conclude the contrary, namely that Mr. Albolga Simi was actually credible, this Court should defer to that finding. Your Honors, Mr. Albolga Simi is seeking asylum in the United States on account of his political opinion, namely alleging that he was a member of the Islamic Labor Party of Tehran, and that this dissident organization was targeted by the Iranian government, and because of his membership, the government was after him. Mr. Albolga Simi had two separate removal proceedings where he was represented by counsel to present evidence sufficient to meet his burden of proof for asylum eligibility. And at both hearings, his testimony contained inconsistencies with his supporting documents. And this Court has held in Chachab v. INS that the agency can use such inconsistencies to properly form an adverse credibility determination. For instance, Your Honors, Mr. Albolga Simi wrote in his asylum declaration that he was a prominent leader in this political organization, that he was the vice counsel of the Islamic Labor Party of Tehran, and he submitted a party membership card listing his title as the Assistant Establishment Director in Affairs of Provinces. And yet before the immigration judge, he testified that he was, quote, not in the administrative organization of the party. On cross-examination, government counsel asked him to explain his leadership position, and he again said, quote, the student didn't have any leadership, and that, quote, there wasn't any special leadership, and that, instead, he was merely a representative to a council and voted on issues. Comparably, his descriptions of his alleged kidnapping in the summer of 1999 contained inconsistencies. Mr. Albolga Simi has suggested that the government was targeting him because of his political membership in this organization, and that it wanted to kidnap him to make him disappear. In his asylum application, he said that a friend was going to pick him up at his house, and they were going to go swimming somewhere in Tehran, and that they came to his home, and a man by the name of Hajj Agaha was driving a vehicle. And yet, in his hearing, he testified to different details regarding the alleged kidnapping, saying that they had called him and were no longer going to pick him up at his house, but were going to go somewhere else where they would find him, and an individual by the name of Ali Kangahe was driving the vehicle. When asked later if he could explain why he was inconsistent with his asylum application, Mr. Albolga Simi suggested that his asylum application was an error. Your Honors, Mr. Albolga Simi cannot claim that his asylum application was an error here because at his first hearing before the immigration judge, he specifically was asked whether his application was correct, and he said that it was. Moreover, the argument now that his application was an error of speech is because he had a second hearing where he was represented by counsel, and if the application was an error, he had an opportunity to correct it but failed to do so. Finally, Mr. Albolga Simi was inconsistent regarding his arrest and interrogation. He claimed that he was arrested in 1999 and detained by the authorities, and they questioned him about his sister's conversion to Judaism. And he said he responded by, quote, calling the officers' names for calling my sister a whore for marrying a non-Muslim, and I became entangled in a scuffle with one of the officers. He was very specific in his declaration as what to happen, but when he went before the immigration judge, his testimony differed. He said, quote, that he did nothing. And on cross-examination, he said, quote, I didn't insult them back, and asked if he could explain why there was inconsistency. He again said, no, I didn't insult them. I didn't curse at them. Secondly, Your Honors, the Board of Immigration Appeals properly found that Mr. Albolga Simi's demeanor, because of his evasive responses to questionings, was a proper adverse credibility termination. This court has found in both T'Chall v. INS and De Leon Barrios v. INS that the agency can properly base an adverse credibility termination on the demeanor based on evasiveness, provided that such evasiveness is apparent in the record. And the evasiveness is apparent in the record before this court. Mr. Albolga Simi was asked if he could explain the inconsistencies regarding the alleged kidnapping with who was involved and the details. Okay. You were there. Or you weren't there either? No, I wasn't, Your Honor. Okay. So let me ask you the same question, because we, as you know, we have a lot of these cases. And as you know, it's difficult when you have a transcript that is not the best. And I would say you would have to agree that this is not the best in terms of coherence. Who is, in your view, whose responsibility was it? Did the government attorney have some obligation to say, you know, this is the – how do you think that this – how would we best – who was responsible for best helping a reviewing court like us or the BIA, which had some problems with it as well, would appear, to make sure that these records come out so that they're at least as coherent as they can be? Well, Your Honor, as you said previously, the immigration judge does have a duty. Yeah. And that if there is a problem, then the immigration judge's responsibility is to point that out. And here, government counsel was consistently asking Mr. Albolga Simi if he could explain his inconsistencies. And every time he asked particular questions, if he could do so, Mr. Albolga Simi failed to do so. I mean, the government attorney pointed out to the court that he was nonresponsive or evasive. Specifically, he was asked about his kidnapping, and he was asked why these individuals he had named were targeting him. Mr. Albolga Simi failed to answer, repeatedly saying that they were excited at the time they came after him, but that was it. How many times in the record did the government lawyer say that that was nonresponsive or to point out that there might be a problem? I don't know the exact number off the top of my head, Your Honor. I saw one. I know it was frequent, but on the record, I would say probably between five and eight times during the questioning in the cross-examination. And what should the I.J. have done? The I.J. intended to point out the evasiveness and try to get Mr. Albolga Simi to answer them, but at the time when the government counsel had asked him specifically about these particular issues, Mr. Albolga Simi failed to do so. So it sounds to me, to respond to my sister's concern, that I guess we could look at this record two ways. It's either, as Ms. Vamani suggests, a problem with the interpretation and perhaps the transcription, or it's a problem with the petitioner's testimony itself in the fact that he was being evasive and inconsistent. Well, getting to the petitioner's point about the language, Your Honor, the government maintains that that issue was not exhausted before the immigration judge and board of immigration appeals. However, the record is clear that the immigration judge asked Mr. Albolga Simi if he had any difficulties with the Farsi translator, and he said at each hearing that he did not. This is on pages 109, 120, and 181 of the administrative document. Were they two different? They changed, I believe, from the second hearing. But each time, he said he didn't have any problems. If he did have a problem with the translator, he has an obligation to bring that before the immigration judge in order to exhaust that claim. How much English did he understand? That I'm not aware of, Your Honor. I know he answered some questions in English, but the primary language of the hearing was Farsi, and he was told to wait until the Farsi translator had stopped translating the judge and the counsel's questions. It would be kind of hard for him to have a problem if he didn't understand how the translation was going. But his counsel, Your Honor, who was there to represent him, should have been aware that there may have been a problem with the translation, and as the record indicates, government counsel pointed out repeatedly that he was asking questions to Mr. Albolga Simi, and he was not answering the questions asked. The immigration judge also told him. Counsel? Did counsel speak Farsi? Which counsel? His counsel. That I'm not aware of, the record doesn't say, Your Honor. As to the demeanor, Your Honors, beyond the evasiveness regarding the kidnapping, Mr. Albolga Simi was also nonresponsive about the reasons why he left Iran. He testified that he received a visa from the United Arab Emirates in 2001, but then traveled back to Iran. Even though he had a visa to come to the United States immediately, government counsel asked him why he had traveled back to Iran, and at first he said he wanted to show the Iranian government that he had, quote, good faith in returning, but then he claimed he needed an exit visa from the Iranian government before he could leave the country, even though he had already left and gone to the United Arab Emirates. He was also evasive about the kidnapping and his relationship with the Iranian government. Specifically, he was employed by the Iranian government as an election supervisor in 2000, yet he failed to explain why that same government which was employing him was going to kidnap him a year earlier in 1999 because of his dissident political activities. You've just about used your time. Yes. And for the foregoing reasons, Your Honors, the Office of Attorney General requests this Court to uphold the adverse credibility determination. Thank you. Thank you. Do you have anything you wish to add? Very briefly. Yes, Your Honor. The most important thing I would like to discuss is the fact that the immigration judge, at the time that she made the final determination, or she made the final determination, she told the government attorney that she didn't know how she was going to decide on this case. Therefore, if credibility had been established, if she felt that my client was lying, she wouldn't have had to think about this, Your Honor. But she stated in the record that his demeanor showed that he wasn't credible. Demeanor is a gut feeling. You don't think about the demeanor.  So the fact that the judge made this made that she wasn't sure whether to believe my client or not. She wasn't sure. She shouldn't have made a determination based on demeanor, number one. The second thing, which is very important to us to do. Do you have law for that? No, Your Honor. But demeanor is a – when this is looking at someone and seeing someone and feeling whether that person is telling the truth. You don't – when we're talking about statements, you can go back and check it against the record and think you may have made a mistake on thinking he was telling the truth. But demeanor is something that you observe. I think we – I think we understand your position. You have used more than a minute. Oh, okay. Thank you. The matter just argued is submitted for decision.
judges: Goodwin, Schroeder, Tallman